May it please the court. My name is Bert Newborn. I represent the appellants in this case, and the appellants are appealing from essentially two orders, a sua sponte Rule 56 grant of summary judgment on the meaning of the text in question, and a Rule 12b6 motion holding that the text is judicially unenforceable. So the timing of these cases overlap, and it's almost impossible to separate them, but you'll see we did a lot of separate time, and looking at it last night, probably too much time to one or both, but I'm concerned that both lawyers don't make the same arguments regretting the political doctrine. We'll try. I mean, well, we worked on this together for a long time, and we've tried to deal with that. I hope we don't. I hope we don't overlap. Let me start with this, and this is maybe, I'm not sure if there was a full moon last night or not, but there should have been. The posture of this case, I also find, I'm sorry, that's the Schwartz case. The Schwartz case posture I find a bit confusing because of the way summary judgment was handled by the judge. This one, I think, there's clean jurisdiction. This one, no amount of prayer will make the jurisdiction go away. What did Judge Debevoise, in his reasoning as to why this is a political document not subject to private enforcement, what did he get wrong? Because frankly, as our reader, he makes a very compelling argument and very compellingly lays out the text of the document. One thing that may be going to happen, we're going to have a hard time getting past, the foundation law specifically says that the foundation is the exclusive forum. It really does read as though, when you take the entirety of the Berlin Accords, that what the parties intended was that any kind of problem, the result would be diplomacy, and you'd use the office of the German government to prevail upon, I guess, would be the foundation to try to resolve any dispute. But clearly not the kind of unilateral contract that you're arguing now. Well, Your Honor, that is, of course, a central issue. I hope to talk about the meaning of 4D first. No, no, no. I mean, obviously, if that is troubling you, let me change the order of my role. Because we don't get to the meaning of 4D if it's a political document. No, no. I mean, if that's troubling you, let me start there and I'll get to the meaning in a moment. There's a fundamental distinction that sometimes gets lost here that Judge Bossler made when the cases were before him. And that the circuit made the last time this case was here, which was on a political question issue. And the distinction is between enforcing the terms of the foundation law, which essentially sets out an allocation, saying you're entitled to this much, you're entitled to this much. If you prove this, you get this much. Those terms are set aside. The enforcement of that is what the statute gives to the foundation. And I've consistently taken this position. If someone thinks the foundation makes a mistake and gave money to someone and they're not supposed to give money to someone, that is not something that you come into an American court or even a German court. That's something that the foundation decides inside itself because it was designed to be autonomous. But there's a second set of concerns. And the second set of concerns are the antecedent promises that the parties made to fund the foundation. There are two sets of promises. One is a promise to give the foundation money. And the other is a set of promises or statutory requirements that the money be spent in a particular way. There's no hint. And Judge Bossler found this. The Third Circuit found this. There is, in the prior appeal, there's no hint that the parties intended to give away the ability to ask questions about whether the money was put into the foundation. Whether the antecedent promises were kept. All that was given away, and we all chose it because it was the best thing, was to say that the foundation is going to distribute the funds without interference. Putting aside the role of the foundation for a moment, Why wasn't it reasonable for Judge Debevoise to, in effect, conclude that all private parties, plaintiffs on the one side and German corporations on the other, were going to depend on the leverage that could be brought to bear by the two governments to make sure that the money promised was delivered? Well, that, sir, there is an easy question, an easy answer to. The answer to that lies in the 50 years that the victims in this case, in these cases, went without any compensation at all. It was because it was not convenient for the various governments in their national self-interest to pay attention. The circumstances changed and it became viewed as in the self-interest of both governments to try to promote a solution here. For that moment, for that moment. Of course, the governments were enormously helpful here. We don't have a deal without the governments. But to suggest that the private lawyers who had watched for 50 years while they were unable, they were blocked from enforcing their clients' rights because of the existence of diplomatic blocks. The London Debt Agreement. And in this very case, in this very case, in 1997, when the district court dismissed us on the merits because they construed the 2 plus 4 treaty as having waived our rights, there was an appeal to this circuit. The Justice Department tried to file a brief supporting us on the merits in this circuit. And the State Department, and Secretary Eisenstein, he discusses it in his book, it's not a secret, he quashed the brief on the grounds that it was not in the diplomatic interests of the United States to do that. That's all interesting history, but I'm not sure it really gets to the response to the question that I'm trying to ask, which is why we should reject the idea that private parties on both sides were depending on the good offices of the two national governments. Well, Your Honor, I was one of those private parties. I helped negotiate this agreement. And I tell you, when I watched my government not enforce their rights for 50 years, and I watched my government in the context of these negotiations quash the appellate brief in this court, it was inconceivable that we would then turn around and say, we'll leave the rights of our clients to the good offices of diplomats. What bundle of rights are you talking about? Because you already said the foundation law contains within it some bundle of rights that goes only to the foundation. The rights I'm talking about is the clients I represent in this case were all plaintiffs in slave labor cases against German companies. They all gave up their rights with prejudice in return for a promise that the German foundation would be funded at a particular level. There is no way, you know, this is quick, I've used it so many times that I'm almost embarrassed, but the last time we argued here, Judge Stapleton raised exactly that. And Judge Stapleton said, you know, these lawyers would have to have been temporarily insane if what they did is simply give up their legal rights in return for some promise of a diplomatic enforcement that had never been forthcoming and that wasn't even forthcoming in this case. It's a compelling argument in the circumstances surrounding that amplify the extent to which that argument is compelling. You mentioned the London debt agreement earlier. One of the things that strikes me as undermining your argument is Article 17 in the London debt agreement. The same provision that was written in the London debt agreement in Article 17 could have been written into one of the Berlin Accords. They could have specifically said that the parties will have the right to enforce provisions in the courts. I guess it would be the German courts. Well, or some courts. I mean, you're right. I take it what Judge Debovois really held below is that, look, this is a diplomatic document. Diplomatic documents are usually not judicially enforceable unless there's some evidence of an intent to make them privately enforceable. I look at the text. I don't find that evidence, and therefore, I hold that it's not enforceable. And with respect and great respect for a great trial judge, I think he's wrong on four levels. And if I could put those levels out to you, perhaps I would answer your question more effectively. He was wrong on the first level because it's no longer a debatable question. What part is not a debate? The enforceability of the financial agreement in the joint statement. The issue is how you enforce it. But it's no longer an open question. The Supreme Court in the Garamendi case enforced it. They enforced it at the plate. Garamendi is very – there's a reference to this agreement in footnote two in Garamendi in a very different context. And all they did was say that this was an example of a governmental – basically a governmental agreement. But they didn't say specifically that in footnote two. They didn't say that the joint agreement, the foundation law, and the executive agreement gave rise to a private cause of action or the right to sue as a unilateral contract. Well, if you take a step back for a moment in Garamendi, what else could they have been enforcing? Remember, Garamendi is a situation where California gave greater rights to the victims than the joint statement did. And the argument was that the joint statement creates a ceiling on the amount of rights that you can give to the victims. The defendants in this case went into an American court and enforced that ceiling. That's what Garamendi is. They enforced the ceiling by arguing that the executive agreement preempted California's attempt to go above it. They did the same thing in the Winters case. Wait a minute. Before you go on to Winters, what I hear from what you're saying is that the Garamendi ruling by the Supreme Court depended in substantial part on the executive agreement. It did. And maybe in the context of the other two texts, but still depended critically on the executive agreement. As I understand your theory of recovery in this case, it depends entirely on the joint statement, not the executive agreement. Well, because the executive agreement has no substantive rights. In other words, usually an executive agreement, say the ones in Pink and Belmont, they usually have some sort of substantive norm. So you're saying that your case depends on the text of the joint statement. No, it depends on the interrelated, the three documents, are the joint statement, the executive agreement, and the German statute. You're relying on paragraph four, but you are saying you have to look at the totality of the three documents. Those were the three Berlin agreements. And in fact, the executive agreement has no function whatever, except to reinforce and enforce the joint statement, because it doesn't create any rights. It doesn't create any substantive norms. Judge Mosler mentioned that. He said this is a very strange executive agreement. This is an executive agreement with no substantive content. It simply essentially borrows the substantive content of the joint statement and makes it enforceable. Meaning that this case has already been decided by the Supreme Court in Garamendi. I'm struggling to see how that's so. You have an ambiguous footnote about something that wasn't the central issue in the Garamendi case. Let me try one more time, and then I'll just say I've been unpersuasive. Garamendi is an action by insurance companies saying that California was giving too much money to the victims. They defined the amount of money that could go to the victims by the joint statement. The joint statement creates the substantive ceiling. When they were asked, well, how is this substantive ceiling enforceable, they said, well, the substantive ceiling is enforceable because an executive agreement showed such an important national interest in this that it should preempt California's effort to go above the ceiling. But where do you find the ceiling? There's no ceiling in the joint statement. That's why I'm having trouble with what you're arguing. There's nothing in Garamendi that I can derive, and it's only in footnote two that the issue comes up, that you can rely upon to suggest that the Supreme Court was either in dicta or by way of holding, concluding or suggesting that a private cause of action arises out of the joint agreement or the executive agreement. The cause of action was a cause of action that was made ultimately powerful by the executive agreement. No question about it. The executive agreement is what creates the preemption. But it is an empty preemption. Preemption in favor of what? It's preemption in favor of the joint statement. And if you were to hold here that we can't enforce the joint statement, the ultimate effect is that the joint statement is enforceable as a ceiling but not as a floor, that the defendants can go into court and say, anybody who tries to give the victims more than the joint statement gave them, we can enforce that in a federal court and make them stop. But if we don't give the victims what we promised to give them, they can't come into a federal court and say that you must at least live up to your deal. Gower-Mendee, we think, implies that the entire package is judicially enforceable as both a ceiling or a floor. It would be a dreadful. If we find that argument persuasive, that's the end of the case because there's no question we have to follow the Supreme Court. It's the end of the enforceability case. Yeah, yeah, on this issue. And might I say it's not just. Winter. Yeah, it's not just. Suppose we don't find it persuasive, then what does winter add? Well, winter is a situation where they explicitly enforced the joint statement, where then Judge Mukasey, then Chief Judge Mukasey, was the trial judge. There was an insurance action before him. There was a question about whether or not several of the Swiss insurance companies fell within the definition of German company within the joint statement. And he said, I consider this a settlement agreement. I'm going to have to enforce it. If I find that they are within it, I'm going to dismiss their cases. If I find they're not within it, I'm not going to dismiss their cases. Everybody agreed with that. Why isn't that just a working hypothesis to simplify the adjudication of a case rather than itself an adjudication? Because Judge Mukasey said explicitly I wouldn't have Article III jurisdiction. I'm not going to issue a kind of advisory opinion about whether somebody is in or out of this unless it has legal consequence. And he explicitly said twice that there's legal consequences here. I am enforcing the agreement. And they asked him to enforce it. The defendants asked him to enforce it. I suggest to you they just can't go into court in one place and say that the agreement is enforceable and get benefits and then come into this court and say that the agreement is not enforceable. They virtually changed their position. The question is by whom? The question isn't whether the court. No, no, they didn't say. Who has the right to enforce it where? Well, I'm sorry, Judge Michel, I don't want to, I don't mean to disagree with you. That's not what they, they didn't. That's all right. That's all right. They didn't say before Judge Mukasey it's enforceable diplomatically. They said it's enforceable by you as a settlement agreement and we ask you to enforce it. That's what they asked Judge Bostler to do in the Frumkin case. Frumkin didn't accept the settlement. He wanted more money. They went to Judge Bostler and they said no, he can't have it. And we dismissed. Now, if I could, because time is short.  Well, I think on remand you said you have to decide two things. You have to decide what it means and whether it's enforceable. Judge Bostler had said that it was unenforceable because of the political question, and you reversed him there. But in Frumkin, he enforced the document. When you were done, Mr. Frumkin was out of court. Because he wanted more money than the joint statement. Over and over again, when somebody wants more money than the joint statement, the defendants come into the court, they enforce the joint statement, and people are out on the street. I'm suggesting it's got to be a two-way street. Those same people should be able to then say, well, at least live up to your minimum obligations. So your argument really is that the defendants should be stopped from making the argument they're making, rather than this panel should feel compelled to follow Judge Mukasey and Judge Bostler. Well, I phrased it in my reply brief as a combined judicial estoppel of stare decisis. It might be an easier issue to get to. There are all the elements of judicial estoppel, but there are also the elements of stare decisis. Now, if I could, just for a moment, there are three other reasons why it's enforceable. I mean, if I can't make the Garamendi and the Frumkin and the Winters case fly, there are three other reasons. The district court, I think, made a fundamental mistake. The district court mislabeled this as a diplomatic document. This is a unique document. There's never been a document like this. I went back and looked everywhere to see if I could find a document that was simultaneously signed by governments and by individuals, where individuals had financial stakes in it and the governments couldn't find one. I found an 1838 Indian Treaty, but this is literally a new animal. And it seems to me that it begs the question to say that it's a diplomatic document, just because certain aspects of it are signed by the government. It's really two separate agreements in the same piece of paper. One agreement is a private deal between private people to dismiss a lawsuit in return for a very substantial financial consideration. The other set of agreements are agreements by governments to help make that possible. We don't for a minute suggest that the agreements involving the government are judicially enforceable. You can't force Germany to pass a statute. You can't force the United States to create an executive agreement. But once they actually live up to the deal, every government did exactly what it promised. Once they live up to the deal, the private promises in that arrangement are enforceable like any other set of private promises. Again, how? You're saying enforceable in courts of law. Well, because then the presumption goes exactly the opposite. On a contract. There it's a contract. It's a private contract which is presumed to be enforceable unless the parties say it's not. And there is not a hint. Let's assume you're right. How would the plaintiffs enforce it? They'd bring action against the foundation, against the individual companies in Gafi? Against the companies. This is an action against the companies. This is not an effort. If they bring the action against the companies, then what about the language in the foundation law about the inclusivity of the form? That came up in the last argument. And I think there's a simple answer to that. This is a kind of settlement agreement. And the settlement agreements usually have a clause saying that nothing in the settlement agreement shall imply that there's any liability or any fault. There were fault clause in an ordinary settlement agreement. We couldn't put it into this agreement because this agreement was all about moral fault. I mean, it would have been horrible if there was something in there saying it's not our fault. We didn't do anything. That was designed to say that you couldn't use this agreement as essentially an admission to go forward and look at it. That language is a compelling argument. But if I didn't have the language in front of me and I heard that argument, I would be not only be persuaded, I'd be blown away by his logic. But it's so inconsistent with the language. But you're suggesting to us that that language then does exactly what Judge Stapleton said we would have been crazy to do. Don't forget, we dismissed all of our claims with prejudice before they put their money into the arrangement. We're not bound by one judge's opinion about the sanity of counsel. No, of course you're not. I was just answering Judge McKeon. I think it's in the Southern District cases. It's specifically dismissed with prejudice. But it could be pursuant to 6 to B if the funding wasn't forthcoming. You could always go back and get relief from that. Well, it's in Judge Bossler's orders here. I mean, we put it in on purpose. You're not as crazy as you're arguing that you are. But we put that in. We put that in. You don't have to recite that something is subject to 6 to B to have it be subject to 6 to B. It's automatically subject. The recitation of that material in the order was to give us a vehicle to enforce the settlement. I mean, it was designed to be a retained jurisdiction under Kokkonen. And Judge Bossler said we weren't explicit enough. Let's assume the things are dismissed. The funding is not forthcoming. The 5.1, I know there's an issue about the 5.1 versus 5. But however many billion Deutschmarks were anticipated and agreed to and not paid into the fund, has been dismissed with prejudice if that hadn't happened. And I know arguably, given the interest considerations you're arguing, it did happen. But let's assume that it did happen because the principle, and using that term I know gets me in trouble in this argument. But using the principle devoid of the 100 billion Deutschmark figure, 100 million Deutschmark figure, how would then the 6 to B have played out? What would have happened? We would have had a choice. We would have had a choice. We could have used what I call the nuclear option under 6 to B and blown up the agreement and then just proceeded again. Nobody wanted to do that given the age of the victims. We all desperately wanted to save the deal. Or we could have used what I call the, not the nuclear option, the rifle shot option, which is the option held out in Kokkonen where a judge retains jurisdiction over a settlement and can enforce the provisions of the settlement agreement if the settlement is not complied with. That's why the 6 to B is there. It turned out that Judge Boslow said under the rules of this circuit, this circuit has a very, very restrictive view of Kokkonen, that merely reciting 6 to B wasn't enough. Rather than appeal and bring a new case to this circuit, I simply started a new action because there's alienage jurisdiction and we'll simply enforce the agreement under alienage jurisdiction. But 6 to B would and should, we think, have been a speedy vehicle for the enforcement of the settlement agreement. I have two more before I have to sit down if you don't mind. It has been for a while. It barely aired in your brief. We're quite aware of the foreground. And we're going to get some redundancy, I think, from the next case. But as Judge Mischel said, Chief Judge Mischel, it has been aired in a very, very well-written brief. We're aware of it. And actually, I thought it was more than four. You have six bases that you're arguing a unilateral contract on. Yes, the unilateral contract and the fact that we believe with great respect that the district court's idea of the presumption against enforceability in diplomatic documents is a 19th century idea which is no longer enforceable. All nine members of the Supreme Court in Medellin rejected the idea that there's a presumption against enforceability. The district court viewed this against what I think was an erroneous assumption that we had a very heavy burden to prove that it was enforceable. When, in fact, what the Supreme Court says in Medellin is that there's no burden. You just start fresh. It's a preponderance. It's not some sort of clear and convincing evidence test. And with deep respect for one of the great trial judges of our time, I believe that he was using an outdated test on the enforceability even if you look at it as a diplomatic document. And then finally, as either Section 90 reliance or an option contract, they got every single thing that they are entitled to. The defendants in this case got everything. They got dismissals. They got protection against future agreements. Every person in this agreement has lived up to their requirements to the very end. Every government, every person. When that happens, under standard contract law, throw out the enforceability of the agreement. Treat it as a freestanding matter. Under standard contract law, it is a violation of principles of unjust enrichment to have somebody say, if you walk across the Brooklyn Bridge, I'll give you X amount of money. And then everybody walks across the Brooklyn Bridge. At that point, you have a quasi-contract obligation or a Section 90 obligation. This really is a new ground. It's in the brief. I'm sorry. I get a little – I've been arguing this perhaps too long. Yeah, I'm sympathetic. I can see. There's no way you could be involved in this from your side and not get fined up. It's a very compelling – I wish I had time to talk to you about the meaning of the text, which is itself very difficult. I'm sure I'll see her again. For some reason, I seem to be for the next three or four years, I have nothing but NYU law clerks. So I'm sure our past – No, no, no. Thank you, Judge. That's very kind. But that's not the context in which I hope to talk to you about. Okay. Thank you very much. Thank you. Good morning, Your Honors, and may it please the Court. I'm Roger Witten, representing the appellees. Let me start with Frumkin because Mr. Newborn, my friend – Can you pull that a little bit closer? Such great emphasis on Frumkin. Judge Bassler could not have been more explicit. He said, quote, at page 389, The German Foundation does not form the basis for this dismissal. The political question doctrine and considerations of international comedy do. The question is not whether plaintiffs' claims are barred by treaty, but whether his claims are such that they have been committed to the political branches for resolution. I think that puts to rest the reliance on Frumkin, whether it be by stare decisis or – In any event, we wouldn't be bound by Frumkin. Excuse me? In any event, we're not bound by Frumkin. The point Mr. Newborn was making is that Judge Bassler enforced the agreement, and the language I just read makes it absolutely clear that he did not think he was enforcing the agreement. Now, Mr. Newborn and I have argued this to a number of courts at a number of times, and every time I'm able to stand up here and say as I now do, he never talks about the text of the joint statement. In this case, the gross case turns entirely around the text of the joint statement, a document negotiated and signed by eight sovereigns as well as private court. As I asked my question about where did Judge Newborn's voice get wrong, it seemed to me he went very meticulously through the text and tried to glean from the text, but now we're talking about an intent to privately enforce a political document. As he should have, because given the involvement of eight sovereigns in this creation of this document, the Supreme Court's decision in Medellin versus Texas is indeed at least relevant to how this court approaches, I don't say more than that. His argument that there would have to be something wrong, given the history of this case and the incredible human dynamic behind it, that no group of plaintiffs in their right mind would have surrendered their rights in this context without any individual recourse left to them if the other side didn't fulfill. This was not a meaningless document. Let me read what I think is the relevant instruction from Medellin and then go straight to the question of enforceability. What the Supreme Court said in Medellin, which I believe has a bearing on this court's consideration of this issue, is as follows. Quote, international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts in the absence of expressed language to the contrary. And that's Article 17 in the London Debt Agreement. Article 17 and Article 28 in the London Debt Agreement. Article 17 instructed Germany to create, to enact legislation that would make the courts available for enforcement and Article 28 of the London Debt Agreement provided an arbitral tribunal for disputes between the signatories if there was a question as to the interpretation. Now, in terms of remedies, this is not a case about how you characterize the obligation. The German companies had every intention to fulfill their commitments as expressed in the joint statement. But that does not lead ipso facto to the conclusion that the plaintiffs have a private right of action in a U.S. court to enforce it. First, Judge McKee, as you mentioned earlier, it is undisputable that prior to the dismissals of the underlying actions, the parties, the participants, focused intensively on the possibility that there would be a funding shortfall. And the, quote, the agreed upon solution, the agreed upon solution to a funding shortfall, was a Rule 60B vacater of the dismissal orders Judge Bassler and Judge Mukasey and Judge Graham eventually entered. On November 13, 2000, Mr. Newborn submitted a declaration to Judge Bassler that said, quote, if full funding is not forthcoming, the dismissals will be vacated under Rule 60B-6, close quote. He said nothing about a private cause of action. Judge Bassler's opinion discusses a potential funding shortfall. This is not an issue that the parties didn't give consideration to. And Judge Bassler decisively observed, quote, the agreed upon solution was to make all of the court's dismissal orders subject to Federal Rule of Civil Procedure 60B. That's at pages 444 and 445. And describing that as the agreed upon solution, that description triggered no objection and no wails of protest from the plaintiffs that there was an other, indeed, more potent remedy. Right. Any dismissal would be subject, I guess you could waive it explicitly, but absent that, any dismissal would be subject to 60B. It's one of those Federal Rules. Absolutely. We didn't have to say it was 60B, but my point is the parties focused on this as the agreed upon solution and took the extra step of mentioning it. 60B, if a 60B relief is granted, the remedy is a vacater. And vacater restores the status quo ante. If the plaintiffs, who are able lawyers, had the far superior right not to return to their lawsuits at the complaint stage, but had the far superior right to actually enforce the joint statement and compel the payment of money, they presumably would have said so to Judge Bassler, and they certainly would have had no reason to urge the district court, Judge Bassler, to confirm a far inferior remedy, 60B, which was in the rules to begin with. I should have asked this to Mr. Newborn. Did you use off time for rebuttal, Mr. Newborn? I had asked for five minutes, but of course I exceeded my time, so it's discretionary. There's been a lot of abuse of discretion. I had asked for five minutes. My question is, and I'll ask it of him, but I'm trying to ask it of you. If the 60B vacater had become a reality, I'm having trouble trying to see what that would look like. As I understand it, there are about 6,000 companies going into the banks, and about 6,000 companies creating this fund. Who do you go after to make the fund, to create the fund? Who do you sue? Annex C and D to the joint statement list the cases that were then pending against German companies. By the way, some of the members of GEFI had not been sued, and by the way, the plaintiffs lawyers who were negotiating the joint statement didn't represent the plaintiffs in all this litigation. Exhibit D is a five-page list of cases where the plaintiffs could not have delivered dismissals. But what it would have looked like was those roughly 60 to 80 cases, I can't remember how many, would have gone back. The status quo ante would have been restored. The dismissals would have been vacated, and the plaintiffs would have had their lawsuits against the 60 lawsuits in various courts for what they were worth. Now, second, so 60B was one remedy in why this was not a worthless document. The second, as Judge Debevoise concluded, is all the claimant participants relied on the power and persuasiveness of the U.S. and German governments to ensure that the agreement would be adhered to. And such reliance on the governments here made all the sense in the world, because as the executive agreement, which is part of the Berlin Accords recited, the Berlin Accords were a culmination of 50 years of diplomatic effort whose objectives were, one, to avoid litigation in U.S. courts, and two, to assign to Germany, to German sovereign institutions, the responsibility for making reparations for the horrific conduct during the Nazi era. And make no mistake about it, this was not just an idle reference to the governments. The U.S. government had a killer remedy. The U.S. government could have declined in the event of funding shortfall to file the statements of interest that were crucial to achievement of one of the main objectives of the German side, which was phrased as all-embracing and enduring legal peace. In addition, the Federal Republic of Germany, by enacting the foundation law, which is referred to as part of the Berlin Accords, obligated German companies to fund the foundation to the tune of $5 billion DM, and that's in Section 3.2.1. And the executive agreement signed by the Federal Republic of Germany provided for recourse to German governmental authorities to any aggrieved person to ensure compliance. So there were real remedies here. There were real remedies in court under 60B. There were real remedies with the U.S. and German governments. Plaintiffs were not left to the mercy of German companies. And with respect to Judge Stapleton, he wasn't right when he made his offhand comment from the bench. Now let me go back to the language, because that's where Medellin says we should start, and indeed what this court said the first time it had this case. I turn to the joint statements text. I said to Judge Zettelberg, I wallow in it because plaintiffs never mention it. And first there is, of course, the title of this document. It's not called Settlement Agreement. If you look at Joint Appendix page 1090, you'll see the agreement between the same sets of lawyers settling litigation by Holocaust victims against Swiss banks. It's called Settlement Agreement. This document, the participants and signatories decided advertently to call a joint statement, a joint statement on the occasion of a final meeting. And Judge Debevoise correctly concluded that this designation is consistently used when an international accord refers to nonbinding statements of principles or summaries of meetings or summaries of expectations and is not used in connection with documents that create privately enforceable contractual rights. And there is not a single case that we were able to find that has ever held that a joint statement was privately enforceable as a contract. Now plaintiffs concede, it took a while, but they belatedly conceded that this document was not privately enforceable against the government signatories. So the question we're left with, given that concession, is whether there's anything in the text of the joint statement that supports plaintiffs' arguments that parts of it are enforceable against the non-sovereign signatories. And as Judge Debevoise, after a very thorough review, concluded, nothing in the joint statement's express language rebuts the double-barreled presumption that an international accord called a joint statement does not create privately enforceable rights. Was that presumption valid? What about Mr. Newpoint's argument that that presumption doesn't have as much vitality now as it may have had at once? He's wrong, because I think he's misreading, but we don't rely on the presumption. You can just look at this language cold, straight up, without a presumption, tilting the scales in any direction. The joint statement does not say that any parts of it are enforceable as a private contract against signatories. It doesn't include any of the clauses that parties who anticipate private enforcement would put in such a document, such as a disputes clause, a choice of forum clause, a choice of law clause. There was a choice of forum clause in the London Debt Agreement, arbitration in the event of a dispute among the signatories as to the meaning. There are three passages in the joint statement that actually talk about the possibility of future litigation. Each condemns it. Those passages are, of course, in the brief. The signatories chose certain nouns and certain verbs to use in the joint statement. The joint statement refers to both the sovereign and the private signatories as, quote, participants, in contrast to the executive agreement, which refers to its signatories as parties. The sovereign and private participants in the joint statement, quote, declare, unquote, in contrast to the executive agreement parties who, quote, agree, unquote. The declarations that the sovereign and the private participants in the joint statement make are broad, non-contractual principles. You could punch your finger into almost any of them, but paragraph two says, as an example, all participants will work together in a cooperative, fair, and non-bureaucratic manner. That's just not the language of an enforceable contract. And nothing in the text manifests Mr. Newborn's wish for distinction between the sovereign and the private signatories on the issue of enforceability. Take a look at paragraph 4A as an example. It describes financial undertakings by both German companies and the German government without any indication whatsoever that the former were privately enforceable while the latter were not. There's a tepid argument advanced in the briefs by Mr. Newborn that the use of the word, quote, shall and will doesn't work as Judge Debevoise pointed out. You just have to track through the text. The unilateral contract theory is, by the way, not in Mr. Newborn's complaint. Before you get to unilateral contract, I take it that Mr. Newborn argues, at least in part, that there are two agreements in a single document or maybe we should say in a single document in the context of the other two documents. And I understand him to be arguing that the privately enforceable contract is found primarily, maybe exclusively, but at least primarily in 4D and in the final sentence in 4D. So what's your response? If that's correct, I mean, maybe I don't understand, but if that's a correct understanding of one of his central arguments, what's your response? All the rest may be not privately enforceable, but this sentence or this whole D is privately enforceable, he says. Yeah. Judge Michel, I think that is his argument, and it's not correct. And let me offer a couple of reasons to support that. One, we know how to draft separate agreements. In the Swiss, when the same lawyer settled the Swiss bank case, we had a separate agreement that was called a settlement agreement. So if you needed a privately enforceable agreement, this group of lawyers certainly had the talent to put one together. Secondly, if you look at the document itself, and I've just given a quick tour through it, there is nothing, not a single word that suggests support for the two documents in one theory. If you look at 4D, it refers both to obligations of the German government and to obligations of German companies. Again, without distinguishing one from the other in terms of enforceability. Well, if you are assuming argumentatively that you're wrong, assuming for a second that you're wrong on the issue of whether or not there's a right of private enforcement here, and I agree that the issue of whether the unilateral contract theory arises from, we can talk about that a bit, but assuming that there is some right here, and let's call it unilateral contract, but there's some right to enforce, then would you concede that this is clearly not a matter for summary judgment, that there's enough on both sides here to create an issue of fact? Judge McKee, we would not concede that. And indeed, we think, because this Court can affirm on any ground that the record makes available, that it can look at the plain language of 4D without reference to extrinsic evidence, and on the basis of the plain language conclude that German companies don't owe additional money. And I'd like to work through that argument quickly if I have a moment to do so. Well, you can do that, but see, you're arguing, I guess, that we don't look to the declarations, but I'm wondering if we can ignore the declarations. If we have before us declarations which might, if we weigh them on a scale, they might well tip in your favor, but they would nevertheless create an issue of fact. How can we not look at the competing declarations? Well, there are competing declarations. Let me put to one side my point that this Court can affirm on the plain language and look at the record based on the declarations. This case started, this phase of this case started with plaintiffs moving for summary judgment on the precise issue of whether German companies owed more money. And on that precise issue, they brought everything they had to court. They brought Mr. Eisenstadt's declaration, they brought Mr. Newborn's declaration, Mr. Weiss's declaration, et cetera, et cetera. None of those declarations, we filed our motion to dismiss and we opposed summary judgment and we brought our declarations, my declaration, Count Lambsdorff's declaration, Dr. Gantz's declaration, Dr. Kohler's declaration. Those declarations unequivocally, because they rely on documents, not unlike the plaintiffs' declarations which rely on what was in their head but was not expressed and was not agreed to. All our declarations rely on documents that were principally the drafts of the agreement. The drafts of this language. My declaration is better than his declarations. Therefore, as a matter of law, I win. But isn't that, by definition, a factual argument you're making, whose declarations are better? No, because where I was headed was to say when you look at all those declarations, and it's important to note the plaintiffs had an opportunity to put in a reply round of declarations to ours and declined to do so. When you look at all those declarations, because they don't rely just on what was in somebody's head but rely on the drafts of the documents, which were many, they leave no genuine issue of material fact. They are fact issues to be sure, but a fact issue doesn't they relate to facts, but a fact issue doesn't require a trial and is disposable on a summary judgment motion if no genuine issue is left. And our submission to the court is that Judge Debevoise properly converted sua sponte without notice and that there was no prejudice here in the circumstances where the plaintiffs moved for summary judgment on the same precise issue, brought their evidence to court, declined to bring more evidence to court, didn't seek, in this case, gross more discovery, and didn't seek any reconsideration. But I see my red light is on. I'd love a minute to walk. We're not really jumping through hoops when the red light goes on. Let me, if I might spend just a couple minutes trying to explain why I think the issue, does 4D require German companies to pay more money, why it's resolvable on the face of 4D. The gross plaintiffs come to this court with one theory, and that theory is that in connection with an alleged deferral period, 4D requires German companies to pay interest on 5 billion Deutschmarks at a rate of 4%, beginning on July 17, 2000 and ending when the money was finally paid. That would have been easy to say. I just said it in one sentence. It was said in one sentence in the Swiss settlement at Joint Appendix 1096. The problem is 4D doesn't say anything like that. 4D does not mention a deferral period. 4D does not mention a 4% interest rate. And by the way, the complaint doesn't mention a 4% interest rate. It refers to an appropriate market rate. Where does that come from? Is that from the foundation law and the German rate, the statutory German rate? The 4% comes from Mr. Newborn's head. There's nothing in the record that refers to 4%. I'm not undermining his head, but I think there's something more substantive than that. There is Section 246 of the German Civil Code, which actually doesn't apply, and the rate was 3.6% at the time and floated. It doesn't refer to the 4% interest rate. The complaint didn't refer to the 4% interest rate. 4D doesn't specify 5 billion Deutschmarks as the amount of principal in which interest was to be earned. Instead, it refers to interest on funds as they were being collected. Well, if they were being collected, they couldn't possibly be 5 billion until the last moment of collection. 4D doesn't identify a start date for interest in July 17, 2000. It's completely irrelevant because everybody agrees no money was owed as of that date. And 4D doesn't identify an end date for interest because it talks about interest accumulating, quote, after transfer of funds to the German foundation. So our submission is this court could affirm, because there is no genuine issue of material fact, one can look at the document itself without reference to extrinsic evidence and conclude that there is simply no support for their theory of the document. And that would be a sufficient basis to affirm. If you'll give me two more minutes, I want to lay out why 4D does support our reading of the document. The phrases, quote, continue to be collected, unquote, and, quote, interest earned thereon, close quote, convey that 4D refers to interest earned on money GEFI was in the process of collecting. Under plainest interpretation, the word, quote, collected, unquote, would nonsensically mean collected and not yet collected. I'm not sure I follow. Say that again. Well, 4D is phrased in terms of interest earned on money that the German companies are continuing to collect. Right. If Mr. Newborn were right, that interest was accruing on $5 billion, it wouldn't have made any sense to refer to the collection process. The collection process would have been irrelevant. Under his interpretation of the word, the reference to the word funds being collected in this document would have to, in order to mean $5 billion, would have to mean collected and not yet collected. But doesn't the subsequent phrase, before and after their delivery, avoid that problem? You're reading my text, Judge McKee. The phrase before and after, quote, unquote, conveys that the sum of at least 100 million Deutschmarks includes, quote, interest earned, unquote, after German companies transfer money to the German foundation. Under plaintiff's interpretation, the phrase before and after would have to nonsensically mean before but not after. Which brings me to the words at least. The phrase at least 100 million Deutschmarks means that if interest earned on collected funds, both before and after their transfer to the foundation, somehow fell short of 100 million Deutschmarks. German companies were obligated to make up the difference. Now that's not an illogical, given what gave rise to this agreement, that's not an illogical result. We want to ensure that the plaintiffs here have the potential of recovering at least 100 million Deutschmarks. No matter what the time of delivery and collection of funds is. It's logical because it happens to be right, Your Honor, because as Judge Debevoise found, based on ample and undisputed evidence in the record, the parties needed an extra 100 million to cover a shortfall that arose because the plaintiffs, the victims, I couldn't unfortunately agree on dividing up 10 billion Deutschmarks. And 100 million Deutschmark patch was needed and this was the fix. And that's absolutely clear as Judge Debevoise found from Annex B to the joint statement, which shows the allocation with precisely 100 million Deutschmarks coming in 250 million Deutschmark tranches from interest. That's a joint appendix 258 and 59. It's equally apparent on the face of the foundation law sections 9-2 and 9-5, which are at Joint Appendix 292 to 293. And it's absolutely explicit in a letter from the U.S. State Department to the German Foreign Ministry, where Ron Bettauer, a U.S. diplomat, said, I would like to reiterate an issue raised by Deputy Secretary Eisenstadt and Count Lomsdorf, namely the absolute need to generate DM 100 million of interest. Thank you, Your Honors. Would you go back to Medellin? And Chief Justice Roberts said, you know, he negated the use of what he called talismanic words and used another phrase called domestic effect. Exactly. Either they didn't teach me at University of Michigan or I was absent that day. Can you address that in terms of the language that is in the statement that the foundation is to be the exclusive remedy, the foundation does not create a basis for claims against Germany or its nationals, which presumably would be its entities, corporations. Would you address that in terms of the domestic effect? I'll try. It seems to me that there isn't any doubt that the joint statement has a domestic effect. The domestic effect was the dismissal of 60 cases pending in American courts, 60 cases involving hundreds of thousands of people with allegations of very substantial damage. The domestic effect of this agreement was that if you put the money into a German foundation, I'm sorry, I shouldn't say if, in return for your putting the money into the German foundation, we will dismiss 60 cases, at least 60 cases, it turned out to be more, pending in United States courts. That's the domestic effect that the Chief Justice was talking about. What he was saying is we have to use common sense here. When someone signs an agreement that has some diplomatic context, and the effect in the United States is to alter the purely private rights of individuals, their ability to contract, their ability to engage in environmental work, doesn't involve the government. Government doesn't have to do anything. When the government is out of the game and it's just private people acting in response to an international agreement, that's domestic effect. And he's saying that under those circumstances you use the common sense, a test that when parties negotiate at great length to create reciprocal rights and obligations under these documents, and one of those reciprocal rights and obligations is an effect on individual people's ability to bring, continue private litigation against private parties. No government's here at all. That's domestic effect, John. But those somewhat elusive words seem to fly in the face of the language of the agreement that seek an embracing and enduring legal peace. Well, but the legal peace, sir, is the legal peace is I promise not to sue you anymore, which is what we did. We promised not to sue them anymore and the United States entered into an executive agreement making sure we don't sue them anymore by providing protection against future lawsuits. The executive agreement and the statute, that's analogous in Medellin to Texas's decision as a sovereign about what to do. We don't contend that's enforceable, but what we do contend is that all nine members of the court very carefully, very carefully said, look, in this new global era where these documents are being signed and they are not involving anything that governments have to do, but they are involving private people living up to their obligations to other private people. That's a domestic effect. And that is. I don't want to take. Thank you, sir. But that's the best I can do. Where is the unilateral theory, unilateral contract theory? Yeah, I was going to write a night in the complaint. Can I just I'll get to the unilateral contract in a moment. Your question to my colleague, Mr. Whitten. We've been doing this for 10 years with a great deal, I think, of reciprocal respect. And his argument, as usual, is an excellent argument. When you ask him about the summary judgment point and he made his best shot at summary judgment. If I could just remind you of what Secretary Eisenstat's declaration says here. This is not this is not something that came from the sky. This is the architect of this agreement. The man who put it together, the man who absolutely put it together, issued a sworn statement saying section of Paragraph 4D, which is the language that we rely upon, was intended to establish a minimum interest figure payable to the foundation in connection with the deferral during the period needed to attain legal peace of the German Foundation Industrial Initiative's obligation to pay 5 billion Deutschmarks to the foundation. The language, which was carefully negotiated, was not intended to establish an interest ceiling or to describe an addition to principle. He flatly contradicts Mr. Whitten's position. Flatly contradicts it. And if the time existed, I would take you through 4.7 to show you that the text flatly contradicts it also. Before and after, and at least, are interest stabilization mechanisms to make sure that the interest rate stays at 4%. You know, I said it in my brief. What we were forced to do. The reason this doesn't look like the Swiss bank settlement is because we have governments and we had a period of a delay that made it impossible for us to do a plain vanilla clause. You couldn't do a plain vanilla interest clause because this clause had to do two things. It had to do, as Mr. Whitten correctly points out, guarantee that there'd be 100 million Deutschmarks there, no matter what happened, even if the foundation disastrously invested the money. There would still be 100 million Deutschmarks in interest earned. We needed that guarantee so that the German Bundestag could pass a statute allocating more money than was in the foundation. And as we all know, you can't count on investments to be able to do that. So this was the ironclad guarantee. But the ironclad guarantee also was an interest provision. As Secretary Eisenstat carefully points out, and he carefully points it out in his book, now that left us, Chief Justice Michel, with a very serious problem, a drafting problem. If you have a fixed amount of interest, or a fixed, a guaranteed amount, and you don't know how long the deferral period is going to be, then the actual interest rate will fluctuate depending upon the length of the time. And the parties wanted to lock the interest rate in. They wanted to lock the interest rate in to 4%. And so the assumption was it would take us six months to get the deferral period done. Where's the 4% coming from? The 4% at that time was the default rate, the German statutory default rate, saying that if you don't say what the interest rate is in a document, this is the interest rate. So basically round off 3.6%. Yeah, and it also happened to be the German market rate at that time as well. So what we did is we took, the math works it out. If you take 5 million Deutschmarks and you multiply it by 4% for six months, that's 100 million Deutschmarks. That didn't fly from the sky. That was the 4%. Now, what happens if we were able to get the cases dismissed faster than six months? After all, Judge Bostler acted in four months. At that point, the interest rate would have been 6% because we would have gotten the same 100 million, only it would have been a four-month delay. In order to guarantee that they got the 4% and that we didn't get the windfall and go to 6, that's what before and after is for. Before and after says that if you put the money in, you will still get credit towards your 100 million Deutschmarks even after the money was in the foundation because it would continue to earn interest up to 100 million, and so you would still get 4%. The at-least language is designed to protect us. That if the period went longer than six months, if it went a year, it would only be 2%. Without the at-least language, the at-least language is to keep the 4% calculating during that period. Now, I don't ask you to say... Before you get to Noggs, I do understand that. It seems to me that in summary judgment, there may be some other pretty steep hurdles that you have to jump over, but in summary judgment, it does seem like your argument is... I mean, I was just going to say, you know, in my dream world... Unilateral contract theory. In my dream world... When was that argument made? Unilateral contract theory. Yeah. I've gotten the complaint, why is it before? Now, even if you sweep away... I urge you to look at the text very closely, because the word will and shall is... They're used differently. Will is used to describe the obligations of the governments. That's not enforceable. And that's what Mr. Bethauer says, the State Department official. This reminds me very much of the presidential debates, where the contestants insist on making a statement rather than ask... Oh, I'm sorry. I'll take it back. Unilateral contract. Unilateral contract. Standard... This is a federal common law document. The interest that the Supreme Court recognized in Garamendi in the enforcement of this deal is sufficient to bring this within the usual... So you're not denying the complaint, you're saying the fact you're arguing private enforcement kind of subliminally puts into the case the theory of unilateral contract. Well, that's right. We didn't say unilateral contract in the contract, but we said it's an enforceable document. And the enforceable document is... The doctrine is... It's a simple doctrine. They said to us, you do the following things, and we will put X amount of money into the foundation, which will then go to the victims. We did those things. Every single one of them. The government did those things. Every single one of them. The defendants have received 100% of their bargain, and it was a very good bargain. They're out from under massive litigation, and the door has been thankfully closed on a very ugly and terrible chapter. They got everything they bargained for. Now, under standard contract law... No, that we do understand. And that's why it's a unilateral contract. It's a unilateral contract because it doesn't become enforceable until everything that had to be done got done. But once it got done... I understand why you're arguing it's a unilateral contract. I'm not sure since it's not in Flint where that came from, but you've answered that. Well, it comes from the fact that my preferable argument would be that you should found the cause of action on the joint statement. But if there's no cause of action, if you find there's no cause of action in the joint statement, then there is a cause of action arising out of unjust enrichment, Section 90, and the notion of an options contract. Thank you. You've been very patient. Thank you. Thank both counsel for a very interesting argument. The case is as fascinating as it is tragic. It is really an amazing case. Thank you very much for briefing in your argument.